IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| The Cleveland Bakers and Teamsters Pension Fund, | § § § | |
| Plaintiff, | § § § | C.A. No.: 18-cv-01404 |
| v. | § § | |
| General Electric Company, Jeffrey R. Immelt, Jeffrey S. Bornstein, John L. Flannery, and Jamie Miller, | § § § § | |
| Defendants. | § § § | |

## CLASS ACTION COMPLAINT

Plaintiff The Cleveland Bakers and Teamsters Pension Fund ("Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned counsel, brings the following complaint against General Electric Company ("GE" or the "Company"), Jeffrey R. Immelt, Jeffrey S. Bornstein, John L. Flannery, and Jamie Miller (collectively "Defendants").  Plaintiff's allegations as to itself are made upon personal knowledge.  As to all other matters, Plaintiff's allegations are made upon information and belief based upon the investigation conducted by the undersigned counsel, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, U.S. Securities and Exchange Commission ("SEC") filings, and information readily obtainable on the Internet.

## INTRODUCTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired publicly traded GE securities between February 26, 2013 and January 24, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against GE and certain of its top officials.

2.      GE is a New York corporation that was founded in 1892 and is headquartered in Boston, Massachusetts.  GE is a global conglomerate that operates across a number of business segments and trades on the New York Stock Exchange ("NYSE") under the symbol "GE."

3.      GE Capital Global Holdings, LLC ("GE Capital") is the financial services unit of GE.  GE Capital provides commercial lending and leasing, as well as a range of financial services for commercial aviation, energy, and support for GE's industrial business units.

4.      GE Power, a wholly-owned subsidiary of GE, builds industrial products including power plants, turbines, and generators which generated roughly 30 percent of the Company's total 2016 revenues.

5.      GE Oil & Gas, which includes GE's 62.5 percent stake in Baker Hughes, a GE Company ("Baker Hughes"), is an oilfield services company that engages in drilling and oil pipeline operations.

6.      During the Class Period, Defendants made materially false and misleading statements regarding GE's business, as well as its operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose

that: (i) GE was failing to make meaningful adjustments to its insurance actuarial assumptions; (ii) this resulted in inadequate insurance reserves being maintained in accordance with Generally Accepted Accounting Practices ("GAAP"), which caused billions in unreported impairment charges for GE; (iii) GE's Power and Oil & Gas segments, among others, were knowingly underperforming; (iv) consequently, the value of GE was overstated during the Class Period, and additional undisclosed impairments were necessary; and (iv) as a result of the foregoing, GE's public statements were materially false and misleading at all relevant times.

7.     GE's fraudulent statements and omissions regarding its financial affairs caused the Company's stock to trade at artificially-inflated levels throughout the Class Period, reaching a high of $32.88 on July 11, 2016.

8.     Historically, GE has been known as a "dividend stock," and investors looked to the Company for a consistent stream of quarterly dividends.  Most recently, GE paid out approximately $2 billion in quarterly dividends each year since 2013.  Flow-through dividend payments from GE Capital to parent GE have provided the Company with a majority of the cash flow used for dividends paid to its shareholders.

9.     During much of the Class Period, GE was able to maintain cash flow sufficient to meet its quarterly dividend payments.  As one of America's most widely-held stocks, and one of the biggest dividend payers in the United States, countless shareholders have come to rely on the dividend payments, which are a primary basis for an investment in GE common stock.

10.     On July 21, 2017, GE announced that its annual cash flow test of GE Capital's long term care insurance business revealed that it recently had "adverse claims experience in a portion of our long-term care portfolio and we will assess the adequacy of our premium returns."

11.     On this news, GE's share price fell $0.78, or 2.92%, to close at $25.91 on July 21, 2017, shedding approximately $6.8 billion in market capital.

12.     On October 20, 2017, GE advised investors that it "recently observed elevated claims experience for a portion of the long-term care book at GE Capital's legacy insurance business" and was conducting a comprehensive review of its "premium deficiency assumptions that are used in the annual claim reserve adequacy test."

13.     On this same date, GE announced that its Power and Oil & Gas segment was underperforming, despite repeated prior assurances to the contrary, including statements touting the strength of the Power business specifically.

14.     On this news, GE's stock price fell $1.51 per share to close at $22.32 per share on October 23, 2017, shedding approximately $13.1 billion in market capital.

15.     On November 13, 2017, GE held its Investor Update and stunned the market by slashing its annual dividend in half, from $0.96 to $0.48 per share.  This was only the second time GE cut its dividend since the Great Depression.  The Company stated that its dividend rate was no longer appropriate after realizing its industrial business did not grow as fast as previously expected.  Plagued by poor cash flow, Defendant Flannery, GE's Chief Executive Officer ("CEO"), further explained that GE had been paying out a dividend above its industrial free cash flow for a number of years, and that GE Capital would not be paying a dividend to GE in 2018, stating: "*[W]e've been paying a dividend in excess of our free cash flow for a number of years now*" (emphasis added).

16.     Defendant Flannery reiterated that the "*dividend was predicated on us growing to a certain level that we just did not see happening in terms of industrial cash flow* in the next

couple of years . . . . So, the single biggest delta, I think is obvious, which is what happened in the Power business" (emphasis added).

17.     As a result of these revelations, GE's stock price fell $1.47 per share, or over 7%, to close at $19.02 per share on November 13, 2017, shedding approximately $12.7 billion in market capital.

18.     Furthermore, on November 14, 2017, representatives from GE attended a conference sponsored by Goldman Sachs Group Inc. in which Defendant Miller, GE's Chief Financial Officer ("CFO"), provided additional details regarding the Company's review of its GE Capital insurance reserves:

> [W]e're in the middle of a review of our insurance reserves. ***This is a book of largely reinsured long-term care businesses back from more than a decade ago*** . . . . It's on track for completion in December . . . .  We had announced earlier that ***we had deferred the decision on a GE Capital dividend of about $3 billion in the second half of the year.  At this point in the process, I'd tell you that I expect that charge to be more than that . . . .*** (emphasis added).

19.     This imminent $3 billion plus charge on legacy insurance policies dwarfs a meager $100 million charge that GE previously took in mid-2016.

20.     On this news, the Company's stock price fell an additional $1.12 per share, to close at $17.90 per share on November 14, 2017, shedding another $9.7 billion in market capital, approximately.

21.     On January 16, 2018, GE announced that the comprehensive review and reserve testing for GE Capital's insurance had concluded, and that GE would be required to assess an "***after-tax GAAP charge of $6.2 billion for the fourth quarter of 2018***."  GE further advised that "GE Capital expects to make statutory reserve contributions of ~$15 billion over seven years" and will suspend its dividend to GE for the "foreseeable future."

22.     That same day, on a conference call with investors and analysts, Defendant Flannery stated, in part, that "[c]learly, in hindsight, we underappreciated the risk in [GE's insurance business] book."

23.     Disclosure of this information caused a precipitous drop in GE's stock price causing investors to suffer substantial losses.  In particular, the price of GE's common stock fell from $1.43 per share, or 7.62%, over the following two trading sessions, to close at $17.33 on January 17, 2018, shedding approximately $12.4 billion in market capital.

24.     On January 24, 2018, during a conference call with investors and analysts, GE announced that the Securities Exchange Commission had notified GE that it would be "investigating [GE's] process leading to the insurance reserve increase and the fourth-quarter charge as well as GE's revenue recognition and controls for long-term service agreements."

25.     On this news, GE's stock price dropped again, by $0.45 to $16.44 on January 24, 2018, and continued to decline another $0.26 closing at $16.18 on January 25, 2018, shedding approximately $6.15 billion in market capital.

26.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of GE's securities, Plaintiff and other Class members have suffered significant losses and damages.

## THE PARTIES

27.     Plaintiff, as set forth in the attached Certification, acquired GE securities at artificially inflated prices during the Class Period and was damaged upon the revelation of GE's corrective disclosures.

28.    Defendant GE is incorporated in New York, with principal executive offices located at 41 Farnsworth Street, Boston, Massachusetts 02210.  GE's securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "GE."

29.    GE Capital is headquartered in Connecticut.

30.    Defendant John Flannery ("Flannery") has served as GE's CEO since August 2017.

31.    Defendant Jeffrey Immelt ("Immelt") served as GE's CEO from September 2001 until August 2017.

32.    Defendant Jeffery Bornstein ("Bornstein") served as GE's CFO from July 2013 until November 2017.

33.    Defendant Jamie Miller ("Miller") has served as GE's CFO from November 1, 2017, through the end of the Class Period.

34.    The Defendants  referenced above in paragraphs 30-33 are collectively referred to as the "Executive Defendants" herein.

35.    Because of their positions with GE, the Executive Defendants possessed the power and authority to control the contents of GE's reports to the SEC and the dissemination of information to investors and securities analysts, *i.e.*, the market.  The Executive Defendants had  the ability and opportunity to prevent the publication of false and misleading statements and failed to do so.  Because of their positions and resulting access to material non-public information, the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Executive Defendants are also liable for the false statements pleaded herein, as those statements

constituted "group-published" information, and were the result of the collective action of the Executive Defendants.

## JURISDICTION AND VENUE

36.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

37.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

38.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b).   GE  is a New York corporation, the Defendants conduct business in this District, and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District including that GE's securities trade on the NYSE.

39.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## SUBSTANTIVE ALLEGATIONS

40.     GE is a globally diversified technology and financial services company.   GE offers a wide variety of products and services including aircraft engines, power generation, and water processing and household appliances.

41.     GE Power, a wholly owned subsidiary of GE, builds industrial products including power plants, turbines and generators.  GE Power's products and technologies harness resources,

such as oil, gas, coal, diesel, and nuclear to produce electric power and include gas and steam turbines.

42.     GE Capital is GE's financial services unit.  It provides commercial lending and leasing, as well as a range of financial services for commercial aviation, energy, and support for GE's industrial business units.

43.     GE Capital historically underwrote and reinsured billions of dollars in long-term care ("LTC") insurance policies.  Under these LTC policies, GE Capital collects premiums to insure costs associated with assisted living and other related expenses not covered by traditional insurance.

44.     Generally Accepted Accounted Principles ("GAAP") and SEC rules governing corporate disclosures require insurance companies to collect and review claims experience and other data to set appropriate cash reserves for anticipated insurance claims.  More specifically, GAAP requires insurance businesses to maintain loss reserves – estimates of what they will have to pay to cover losses from insurance claims during a given period – regardless of whether claims have been made.  GAAP requires LTC insurance companies to review a number of factors regularly, including mortality rates and health care costs, to account for trends in updating cash reserves.

45.     GE's quarterly and annual reporting with the SEC must include disclosures about its LTC insurance policy-based liabilities. In particular, GE's reporting must take into account claims paid in the same accounting period, and expectations concerning events and circumstances creating liability and the eventual payment of future claims.

46.     Between 2004 and 2006, GE divested much of its legacy LTC policies when it spun off Genworth Financial, Inc. ("Genworth").  Since at least that time, pricing assumptions in

the issuance of the LTC policies have changed dramatically, caused by certain factors such as increased costs of healthcare in the United States, lengthened life expectancy models, and lower-than-expected interest rates.  As a result of the foregoing, other significant LTC insurance companies have experienced substantial losses caused by outdated LTC origination assumptions. In fact, a securities class action lawsuit was commenced against Genworth in 2014 relating to inadequate cash reserves on LTC policies.  This lawsuit was ultimately settled in early 2016 for $216 million, at which point Genworth increased its LTC reserves by $435 million after an actuarial review.

47.    To date, GE has been unable to sell off GE Capital's remaining $28 billion in insurance liabilities, including reinsurance on LTC policies.  GE purports to have complied with its annual actuarial review of reinsurance assumptions and reservations.  GE, however, failed to make any meaningful changes to its reserves while such changes were being made throughout the industry.  The fact that substantial reserves and charges were being taken industry-wide in the long-term care business, years ago, is significant because GE would have knowledge of this and did nothing with respect to its own GAAP financial reporting during the Class Period, as described below.

48.    The Class Period begins on February 26, 2013, when GE filed an Annual Report on Form 10-K with the SEC, announcing its financial and operating results for the quarter and fiscal year ended December 31, 2012. This 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Immelt, stating that the financial information contained therein was accurate and disclosed any material changes to GE's internal control over financial reporting.

49.     On May 8, 2013, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended March 31, 2013. This 10-Q contained signed certifications pursuant to SOX by Defendant Immelt stating that the  financial information contained therein  was accurate and disclosed any material changes to GE's internal control over financial reporting.

50.     On July 26, 2013, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended June 30, 2013.  This 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained therein was accurate and disclosed any material changes to GE's internal control over financial reporting.

51.     On November 1, 2013, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended September 30, 2013. This 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained therein was accurate and disclosed any material changes to GE's internal control over financial reporting.

52.     On February 27, 2014, GE filed an Annual Report on Form 10-K with the SEC, announcing GE's financial and operating results for the quarter and fiscal year ended December 31, 2013.   This 10-K contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained therein was accurate and disclosed any material changes to GE's internal control over financial reporting.

53.     On May 12, 2014, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended March 31, 2014. This 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and

Bornstein, stating that the financial information contained therein was accurate and disclosed any material changes to GE's internal control over financial reporting.

54.     On July 31, 2014, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended June 30, 2014.  This 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained therein was accurate and disclosed any material changes to GE's internal control over financial reporting.

55.     On November 4, 2014, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended September 30, 2014. This 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained therein was accurate and disclosed any material changes to GE's internal control over financial reporting.

56.     On February 27, 2015, GE filed an Annual Report on Form 10-K with the SEC, announcing GE's financial and operating results for the quarter and fiscal year ended December 31, 2014.   This 10-K contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained therein was accurate and disclosed any material changes to GE's internal control over financial reporting.

57.     On May 4, 2015, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended March 31, 2015. This 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained therein was accurate and disclosed any material changes to GE's internal control over financial reporting.

58.     On July 30, 2015, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended June 30, 2015.  This 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained therein was accurate and disclosed any material changes to GE's internal control over financial reporting.

59.     On November 2, 2015, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended September 30, 2015.  This 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained therein was accurate and disclosed any material changes to GE's internal control over financial reporting.

60.     On February 26, 2016, GE filed an Annual Report on Form 10-K with the SEC, announcing GE's financial and operating results for the quarter and fiscal year ended December 31, 2015.  This 10-K contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained therein was accurate and disclosed any material changes to GE's internal control over financial reporting.

61.     On May 4, 2016, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended March 31, 2016.  This 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained therein was accurate and disclosed any material changes to GE's internal control over financial reporting.

62.     On August 1, 2016, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended June 30, 2016.  This 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein,

stating that the financial information contained therein was accurate and disclosed any material changes to GE's internal control over financial reporting.

63.     In October 2016, GE announced that it was in talks with Baker Hughes to combine GE's Oil and Gas segment with Baker Hughes's oilfield services.

64.     On November 2, 2016, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended September 30, 2016.  This 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained therein was accurate and disclosed any material changes to GE's internal control over financial reporting.

65.     During its Annual Outlook Investor Call on December 14, 2016, Defendant Immelt stated GE's earnings guidance was based on a "***very strong pipeline not just in the Power business but across the portfolio***." (emphasis added).  During this call a JPMorgan analyst noted that the "$6 billion to $7 billion GE Capital dividends to [GE was a] little bit below what [GE] had initially laid out," and questioned whether GE Capital would be able to sustain the anticipated cash flows and dividends.  Defendant Bornstein suggested that dividends were sustainable by stressing that GE Capital was performing well on cash flows, specifically stating:  "We pulled dividends [from 2017] into 2016.  We are actually several billion dollars ahead of the plan that we gave you, we are not behind plan."

66.     On January 20, 2017, Defendant Bornstein reiterated GE's guidance during a call with investors and analysts stating "***Our outlook for Power remains consistent with the expectations shared at the outlook meeting***."  (emphasis added).

67.     On February 24, 2017, GE filed an Annual Report on Form 10-K with the SEC, announcing GE's financial and operating results for the quarter and fiscal year ended December

31, 2016.  This 10-K contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained therein was accurate and disclosed any material changes to GE's internal control over financial reporting.   Specifically, the certifications represented that the 10-K did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  The certifications also stated that Immelt and Bornstein had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting."  Immelt's and Bornstein's statements are attributable to the Company.

68.    GE's 10-Ks and 10-Qs filed with the SEC throughout the Class Period contained language exactly or substantially similar to the language quoted above.

69.    During an investor meeting on March 8, 2017, Defendant Bornstein stated "***We feel really good about the Power business*** . . . .  No change on free cash flow or cash flow, $16 billion to $20 billion, with industrial CFOA [that is, cash flows from operating activities] embedded in there of $12 billion to $14 billion and no change on overview on what is going to get returned to investors" (emphasis added).

70.     On April 21, 2017, during a call with investors and analysts, Defendant Bornstein stated that "***Power had a very strong organic growth quarter***" (emphasis added).  Defendant Bornstein also stated that there was no change to the Company's prior guidance.

15

71.     On May 5, 2017, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended March 31, 2017. This 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained therein was accurate and disclosed any material changes to GE's internal control over financial reporting.

72.     On July 3, 2017, the GE transaction with Baker Hughes for $30 billion was formally completed and, as a result, GE's Oil & Gas segment now includes GE's 62.5 percent stake in Baker Hughes.  GE is not permitted to sell its shares in Baker Hughes until July 2019.

73.     On July 21, 2017, during a conference call with investors and analysts GE announced GE Capital's performance, stating in part: "***We recently have had adverse claims experience in a portion of our long-term care portfolio and we will assess the adequacy of our premium returns.*** We will update you in the fourth quarter." (emphasis added).

74.     Following this news, GE's share price fell $0.78, or 2.92%, to close at $25.91 on July 21, 2017 shedding approximately $6.8 billion in market capital.

75.     On July 28, 2017, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended June 30, 2017.  This 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained therein was accurate and disclosed any material changes to GE's internal control over financial reporting.

76.     On October 20, 2017, during a conference call with investors and analysts, GE announced, in pertinent part:

> ***We've recently observed elevated claims experience for a portion of the long-term care book at GE Capital's legacy insurance business*** which represents $12 billion or roughly 50% of our insurance reserves. As a result, ***we began a comprehensive review in the third quarter of premium***

> ***deficiency assumptions*** that are used in the annual claim reserve adequacy
> test. This is a very complex exercise and the team is making good
> progress. We expect to complete this process by the end of the year. Until
> the review is being completed we've deferred the decision to pay
> approximately $3 billion of additional GE Capital dividends.

(emphasis added).

77.    During this call, Defendant Bornstein stated that GE "***recently observed elevated***

***claims experience for a portion of the long-term care [business] at GE Capital's legacy***

***insurance business, which represents $12 billion or roughly 50% or our insurance reserves***."

(emphasis added).   GE announced that was suspending dividends to address the insufficient

insurance reserves.

78.    The surprises to the market did not end there.   GE also announced that it had

suspended further dividends from GE Capital: "Until the review has been completed, ***we have***

***deferred the decision to pay approximately $3 billion of additional GE Capital dividends.***  Year

to date, GE Capital has paid $4 billion of dividends to GE."  (emphasis added).

79.    On this news, GE's stock price fell $1.51 per share to close at $22.32 per share on

October 23, 2017, shedding approximately $13.1 billion in market capital.

80.    On October 30, 2017, GE filed a Quarterly Report on Form 10-Q with the SEC,

announcing GE's financial and operating results for the quarter ended September 30, 2017

This 10-Q contained signed certifications pursuant to SOX by Defendants Flannery and

Bornstein, stating that the financial information contained therein was accurate and disclosed any

material changes to GE's internal control over financial reporting.

81.    These misstatements and omissions during the Class Period in GE's quarterly

and annual reports filed with the SEC violated, *inter alia*, Item 303 of the SEC's Regulation S-

K, 17 C.F.R., § 229.303(a) and (b), as well as Sections 10(b) and 20(a) of the Exchange Act

and Rule 10b-5 promulgated thereunder.  Item 303 of Regulation S-K requires registered securities issuers (or registrants), such as GE, to describe "known trends or uncertainties that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

82.    Finally, on November 13, 2017, GE held its Investor Update and stunned the market by slashing its annual dividend in half, from $0.96 to $0.48 per share, which was only the second time GE cut its dividend since the Great Depression.  Defendant Flannery further explained GE had been paying out a dividend above its industrial free cash flow for a number of years, and that GE Capital would not be paying a dividend to GE in 2018, stating:

> [T]he reduction of this dividend to $0.48 is a product, really, of where we are as a company right now.  So we had a $0.96 dividend established.  We had a path where we thought the industrial cash flow generation would grow, that would grow into the dividend . . . .  The reality is that hasn't unfolded that way . . . .  *[W]e've been paying a dividend in excess of our free cash flow for a number of years now.*  (emphasis added).

83.    Defendant Flannery reiterated the Company's cash flow forecast reduction, stating:

> **[Unidentified Participant]:** [S]hortly after you were named CEO, it was widely quoted in the Journal and elsewhere that the dividend was safe.  Surprised that you would make such a strong statement early on, which . . . has hurt your credibility right out of the gate . . . .  When did you make the decision?
>
> **[Defendant Flannery]:** So, I think *there's been major change in our cash flow forecast*.  So, the time we went out with that first statement, we were having a $12 billion to $14 billion CFOA.  And the day I started, there was a guide to the low end of that range . . . .  So, we're now at a $7 billion number. . . . [F]undamentally, that *dividend was predicated on us growing to a certain level that we just did not see happening in terms of industrial cash flow* in the next couple of years . . . .  So, the single biggest delta, I think is obvious, which is what happened in the Power business.  (emphasis added).

84.    As a result of these revelations, GE's stock price fell $1.47 per share, to close at $19.02 per share on November 13, 2017, shedding approximately $12.7 market capital.

85.    Furthermore, on November 14th, representatives from GE attended a conference sponsored by Goldman Sachs Group Inc., in which Defendant Miller provided additional details regarding the Company's review of its GE Capital insurance reserves:

> [W]e're in the middle of a review of our insurance reserves. ***This is a book of largely reinsured long-term care businesses back from more than a decade ago*** . . . . It's on track for completion in December . . . . We had announced earlier that ***we had deferred the decision on a GE Capital dividend of about $3 billion in the second half of the year.  At this point in the process, I'd tell you that I expect that charge to be more than that . . . .*** (emphasis added).

86.    That anticipated $3 billion plus charge on legacy insurance policies dwarfed a $100 million charge that GE previously took in mid-2016 following an actuarial review.

87.    On this news, the Company's stock price fell an additional $1.12 per share, to close at $17.90 per share on November 14, 2017, shedding approximately $9.7 billion in market capital.

88.    On January 16, 2018, GE announced that the comprehensive review and reserve testing for GE Capital's insurance portfolio, will result in an "***after-tax GAAP charge of $6.2 billion for the fourth quarter of 2017, and GE Capital expects to make statutory reserve contributions of ~$15 billion over seven years***." (emphasis added).

89.    During a conference call with investors and analysts, Defendant Flannery stated, in relevant part, that "***in hindsight, we underappreciated the risk in [GE's insurance business] book***" (emphasis added).

90.     On this news, GE's share price fell $1.43, or 7.62%, over the following two trading sessions, to close at $17.33 on January 17, 2018, shedding approximately $12.4 billion in market capital.

91.     On January 24, 2018, during a conference call with investors and analysts, GE announced that the SEC had notified GE that it would be "investigating the process leading to the insurance reserve increase and the fourth-quarter charge as well as GE's revenue recognition and controls for long-term service agreements."

92.     On this news, GE's stock price dropped $0.45 to $16.44 on January 24, 2018, and continued to drop another $0.26 closing at $16.18 on January 25, 2018, shedding approximately $6.15 billion in market capital.

93.     The Class Period SEC filings by GE, referenced above, falsely reported revenues, net income, and earnings, and failed to disclose that: (i) GE was failing to allocate sufficient reserves for insurance premium deficiencies (ii) GE's full exposure with regard to GE Capital's legacy reinsurance business was understated; (iii) GE failed to adjust its actuarial assumptions adequately, causing billions of dollars in unreported reserve charges for GE; (iv) GE's Power and Oil & Gas segments, among others, were underperforming; and (v) consequently, the value of GE was overstated during the Class Period.

94.     Problems within the LTC insurance business surfaced in the mid-2000s, and were widely reported in the financial press.  Many insurers were scaling back benefits because they had misjudged how many people would file claims, and how long the policy holders would require benefits.  Many were forced to seek regulatory approval for double-digit premium increases on their policyholders, but even then, the funds fell short to pay out the benefits.  In particular, MetLife Inc., Prudential Financial Inc., CNA Financial Corp. and Manulife Financial Corp.'s

John Hancock were forced to dramatically increase premiums in order to make good on its LTC policies.  In fact, there are only approximately a dozen companies who still sell LTC policies today, down from over 100 a little over a decade ago.  Some LTC insurers were even wound down and placed in resolution.

95.    Since 2007, other companies have had to take a combined $10.5 billion in pretax earnings to boost reserves for future LTC insurance claims.  In 2017, analysts from Credit Suisse projected that the gap between LTC insurance claims and reserves associated therewith may someday pass $300 billion.

96.    These problems were well-known to Defendants.  GE owned Genworth, but spun it off in 2004 in connection with Genworth's initial public offering.  In 2006, GE sold its remaining eighteen percent stake in Genworth.  The spin-off has been described as removing a "drag" on GE's earnings.  Genworth faced its own class action lawsuit in 2014 for failure to maintain adequate cash reserves in connection with its LTC insurance policies, and ultimately revamped its actuarial assumptions.

97.    Genworth's problems continue to this day.  Genworth's CEO, Thomas McInerney, said he spends significant time visiting with state regulators to gain approval for rate increases on LTC policies.  GE, having previously owned Genworth, knew or should have known about these systemic problems at Genworth, and that the problems permeated the entire LTC insurance industry.

98.    Defendants knew or should have known that their Class Period filings were false and misleading and, according to analysts, GE's regulatory filings with state insurance departments demonstrate that claims were draining far more than GE had expected.

99.     Although problems associated with LTC underwriting were rampant throughout the industry, and many insurance providers were acting to increase their reserves and policyholder premium payments, GE continued to assure the market that it faced no problems, and failed to increase its reserves throughout the entire Class Period.  GE knew or should have known, however, that it was not immune from these trends in the LTC insurance field.

100.    Analysts covering GE have commented that it is likely that GE knew about its problems for some time.  For example, Scott Davis, an analyst with Melius Research, wrote that it is "very hard to believe that mysteriously overnight GE found problems they didn't know existed."  Similarly, Jeff Sprague, an analyst with Vertical Research Partners, opined with regard to GE that "[i]t's hard to imagine a $15 billion problem materialized in the course of the year."

101.    As result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of GE's securities, Plaintiff and other Class members have suffered significant losses and damages.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

102.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

103.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward- looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approve by an executive officer of GE who knew that the statement was false when made.

## **PRESUMPTION OF RELIANCE**

104.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiff and other members of the Class purchased GE securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

105.    At all relevant times, the markets for GE securities were efficient for the following reasons, among others:

(a)    as a regulated issuer, GE filed periodic public reports with the SEC;

(b)    GE regularly communicated with public / investors via established marker communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities /analysts, and other similar reporting services;

(c)    GE was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain

customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)    GE common stock was actively traded, regulated exchange, namely the NYSE, under the ticker symbol "GE."

106.    As a result of the foregoing, the market for GE securities promptly digested current information regarding GE from all publicly available sources and reflected such information in GE's stock price. Under these circumstances, all purchasers of GE securities during the Class Period suffered similar injury through their purchase of GE's securities at artificially inflated prices the presumption of reliance applies.

107.    Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153 (1972).

## PLAINTIFF'S CLASS ALLEGATIONS

108.    Plaintiff brings this action as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased publicly traded GE securities, including GE common stock, during the Class Period and who suffered damages as a result of their purchases (the "Class").    Excluded from the Class are (1) Defendants, (2) members of the families of Defendants, (3) the subsidiaries or affiliates of any Defendant, (4) any person or entity who is a shareholder, partner, officer, director, employee or controlling person of any Defendant, (5) any entity in which any Defendant has a controlling interest, and (6) the legal representatives, heirs, successors or assigns of any such excluded person.

109.    The members of the Class are so numerous that joinder of all members is impracticable.    Throughout the Class Period, GE Securities were actively traded on the NYSE.

While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

110.    The names and addresses of record owners of shares of GE common stock and other publicly traded securities purchased during the Class Period may be identified from records maintained by GE and/or its transfer agent.  Class members may be notified of the pendency of this action by mail using a form of notice similar to that customarily used in securities class actions.

111.    Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff will fairly and adequately protect the interest of the members of the Class and Plaintiff has retained counsel competent and experienced in securities litigation and class actions.  Plaintiff has no interests that are adverse or antagonistic to those of the Class.

112.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by many individual Class members may be relatively small, the expense and burden of individual litigation makes it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged.

113.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws and/or state law were violated by Defendants' acts as alleged herein;

(b)    Whether the documents, releases, and statements disseminated to the investing public and the shareholders during the Class Period omitted and/or misrepresented material facts about the business affairs, financial condition and future prospects of GE as particularized herein;

(c)    Whether Defendants acted willfully or recklessly in omitting to state and/or misrepresenting material facts about the financial condition, profitability and future prospects of GE;

(d)    Whether the market prices of the GE common stock during the Class Period were artificially inflated due to the nondisclosures and/or misrepresentations complained of herein; and

(e)    Whether the members of the Class have sustained damages, and, if so, what is the proper measure thereof.

114.    Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

115.    Plaintiff incorporates herein by reference and re-alleges each and every allegation of fact contained in the preceding paragraphs of this Complaint as if fully set forth in this count.

116.    This Count is asserted by Plaintiff and the Class against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

117.    During the Class Period, each of the Defendants participated in some or all of the fraudulent activity described herein.

118.    During the Class Period, each of the Defendants made, participated in making, or legally authorized the making of the false and misleading statements and/or omission with fraudulent intent.

119.    The fraudulent activity described herein was a manipulative or deceptive device in violation of Section 10(b) of the Exchange Act.

120.    The fraudulent activity described above was also a device, scheme, or artifice to defraud, prohibited by Rule 10b-5.

121.    Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute a willful deceit and fraud upon Plaintiff and the Class.    Defendants knowingly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

122.    As a result of Defendants' fraudulent activity, the market price of GE securities was artificially inflated during the Class Period.

123.    Were it not for Defendants' fraudulent activity, GE's investors and shareholders and the market at large would have known that the Company's financial condition was overstated and that GE was overvalued.

124.    In ignorance of Defendants' fraudulent activity or the false and misleading nature of the representations described above, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of GE containing the misleading information, purchased GE common stock at artificially inflated prices.

125.    The price of GE securities has declined materially upon the public disclosure of the true facts which had been misrepresented or concealed as alleged herein.

126.    Plaintiff and other members of the Class have suffered substantial damages as a result of their purchases of GE securities.

## **COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

127.    Plaintiff incorporates herein by reference and re-alleges each and every allegation of fact contained in the preceding paragraphs of this Complaint as if fully set forth in this count.

128.    Plaintiff asserts this Count for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class and against Executive Defendants.

129.    During the Class Period, GE participated in some or all of the fraudulent activity described herein.

130.    The fraudulent activity was a manipulative or deceptive device in violation of Section 10(b) of the Exchange Act.

131.    The fraudulent activity described above was also a device, scheme, or artifice to defraud, prohibited by Rule 10b-5.

132.    GE engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute a willful deceit and fraud upon Plaintiff and the Class.  GE knowingly caused its reports and statements to contain misstatements and omissions of material fact as alleged herein.

133.    As a result of GE's fraudulent activity, the market price of GE securities was artificially inflated during the Class Period.

134.    Were it not for Defendants' fraudulent activity, GE's investors and shareholders and the market at large would have known that the Company's financial condition was overstated and that GE was overvalued.

135.    In ignorance of Defendants' fraudulent activity or the false and misleading nature of the representations described above, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of GE containing the misleading information, purchased GE common stock at artificially inflated prices.

136.    The price of GE securities has declined materially upon the public disclosure of the true facts which had been misrepresented or concealed as alleged herein.

137.    Plaintiff and other members of the Class have suffered substantial damages as a result of their purchases of GE securities.

138.    The Executive Defendants were controlling persons of GE within the meaning of Section 20 of the Exchange Act by reason of their management positions and/or directorships and their business and social relationships with each other and their stock ownership and their access to and holding of vital information and their participation in policymaking and key decisions.

139.    By virtue of their positions and activities, the Executive Defendants had the power and influence to control GE and, exercising such control, did cause GE to engage in or suffer the unlawful acts and conduct alleged herein.

140.    Each of the Executive Defendants was in a position to control or influence the contents of, or otherwise cause corrective disclosures to have been made in, GE's SEC filings and the Company's other public statements disseminated during the Class Period as detailed herein, yet failed to correct statements therein which they knew to be materially false or misleading.

141.    To the same extent that GE is or would be liable to Plaintiff and the Class, each of the Executive Defendants is also equally and jointly and severally liable to Plaintiff and the Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated:  February 16, 2018

/s/ *Daniel L. Berger*
Jay W. Eisenhofer
Daniel L. Berger
Caitlin M. Moyna
GRANT & EISENHOFER P.A.
485 Lexington Avenue
29th Floor
New York, New York 19801
Tel: (646) 722-8500
Fax: (646) 722-8501

*Attorneys for Plaintiff The Cleveland Bakers and Teamsters Pension Fund*

## PLAINTIFF'S CERTIFICATION
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned, Carl Pecoraro, on behalf of Cleveland Bakers & Teamsters Pension Fund (the "Bakers & Teamsters"), hereby certifies as follows:

1. I am familiar with the matters set forth herein and I am duly authorized to make this certification on behalf of the Bakers & Teamsters.

2. On behalf of the Bakers & Teamsters, I have reviewed the complaint filed contemporaneously herewith as well as the facts and documents forming the basis of the claims alleged therein.

3. The Bakers & Teamsters has authorized the filing of a federal securities class action complaint on its behalf against GE and I make this certification in support of that complaint.

4. The Bakers & Teamsters did not purchase securities of General Electric Company ("GE") at the direction of counsel, or in order to participate in any private action under the federal securities laws.

5. The Bakers & Teamsters is willing to serve as a representative party on behalf of the class in this action, including providing testimony at deposition and trial, if necessary.

6. A list of Bakers & Teamsters' transactions in GE securities during the Class Period is reflected in Exhibit A, attached hereto.

7. The Bakers & Teamsters has not sought to serve as the lead plaintiff on behalf of a class in any class action filed under the federal securities laws during the last three years.

8. The Bakers & Teamsters will not accept any payment for serving as a representative on behalf of the class beyond the Funds' *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages), directly related to representation of the class, as are ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed this 14 day of February, 2018.

For Cleveland Bakers & Teamsters Pension Fund:

Name: Carl Pecoraro
Title: Chairman

1